UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OVANES GAZAZYAN,<br><br>               Petitioner,<br><br>    v.<br><br>PAMELA BONDI, et al.,<br><br>               Respondents. | Case No. 5:25-cv-02599-SRM-DTB<br><br>**ORDER GRANTING, IN PART, MOTION FOR A TEMPORARY RESTRAINING ORDER [2]** |

## I. INTRODUCTION

Before the Court is Petitioner Ovanes Gazazyan's Motion for a Temporary Restraining Order ("Mot."). Dkt. 2. Respondents filed an opposition ("Opp'n"), Gazazyan filed a reply ("Reply"), and Respondents filed a sur-reply ("Sur-Reply"). Dkts. 7, 8, 11. The Court held a hearing on this matter on October 10, 2025. Seven days later, Gazazyan filed supplemental briefing, raising new arguments and offering additional evidence that was not offered in the Mot. or Reply. Dkt. 18. With the Court's leave, Respondents filed a brief in response to the supplemental briefing on October 24, 2025. Dkt. 21.

Upon consideration of the Parties' arguments, relevant legal authority, and record in this case, the Court concludes Petitioner's Mot. is **GRANTED, IN PART**.

## II. BACKGROUND

### A. Order of Removal from the United States

As alleged in the petition, Gazazyan was born in the USSR on February 5, 1980. *See* Dkt. 1 at 2; Dkt. 1-2. As alleged in the Petition, in 1994, he was paroled and granted temporary status to remain in the United States. Dkt. 1 at 2. The Petition alleges he became a lawful permanent resident on November 18, 1997. *Id.* at 2.

In 2002, Gazazyan pled guilty in California state court to felony grand theft auto and was sentenced to 16 months in state prison. *Id.* Based on his felony conviction, on February 3, 2004, an immigration judge ordered that Gazazyan be removed from the United States and designated "Armenia" as the country of removal. *See* Dkt. 1 at 3 n.1; Dkt. 8-2 at 1. The immigration judge also denied Gazazyan's applications for asylum, withholding of removal, cancellation of removal, and his requests for withholding and deferral under the Convention Against Torture. *Id.* According to Gazazyan's attorney, he remained in immigration custody "for some period of time" after he was ordered removed. Dkt. 8-1 at 2.

On February 20, 2024, an ICE deportation officer sent a letter to the Consulate General of the Republic of Armenia, asking that it issue travel documents for Gazazyan. *See* Dkt. 1-1. The Consul General denied ICE's request because of "the absence of a relevant record that can prove Mr. Gazazyan's Armenian citizenship." Dkt. 1-1. According to Gazazyan, he was released from immigration custody in July 2004. Dkt. 18-1 at 2.

In 2017, Gazazyan again applied for travel documents from the Armenian Consulate but never received a response. Dkt. 1 at 2. Sometime later, Gazazyan filed a motion to vacate his felony plea in Los Angeles County Superior Court, Case No. XNWLA041528-01, arguing he was not advised of the mandatory immigration consequences for pleading guilty to felony grand theft auto. *See id.* at 3. On November 12, 2024, Superior Court Judge Thomas Rubinson granted the motion and vacated Gazazyan's plea and conviction. Dkt. 1-3. Gazazyan then filed a motion to reopen his

removal proceedings in immigration court earlier this year, which was denied. Dkt. 1 at 3. Thereafter, Gazazyan appealed to the Board of Immigration Appeals. *Id.* That appeal remains pending. *Id.*

### B. ICE Detainment

Since his release, Gazazyan had been regularly appearing for check-ins with ICE. Dkt. 1 at 2. In the first week of September 2025, Gazazyan appeared at a regularly scheduled appointment with ISAP. Dkt. 18-1 at 2. He asked for permission to travel to Las Vegas for his mother's birthday. *Id.* The ISAP official told him he needed ICE's permission. *Id.* Gazazyan spoke to an ICE official the next day and was given permission to travel to Las Vegas. *Id.* The ICE official also told Gazazyan to report back to ICE on September 30, 2025. *Id.* at 2–3.

On September 30, Gazazyan returned to the office, and ICE officials told him they were revoking his release and that he was going to be detained. *Id.* at 3. According to Gazazyan, ICE officers did not tell him the reason for the revocation. *Id.* Upon his arrival at Adelanto Detention Facility, Gazazyan was given a packet of papers. *Id.* Among those papers included a Notice of Revocation of Release ("Notice"). *Id.* The Notice stated that ICE was revoking his release because they determined "there are changed circumstances in [his] case," "there is a significant likelihood of removal in the reasonably foreseeable future," and "it is appropriate to enforce the removal order and remove you to Armenia." Dkt. 21-1 at 2. Relying on 8 C.F.R. § 241.4, the Notice states that Gazazyan is to remain in ICE custody. *Id.* at 2. The official that authorized this decision was N. McKenna, the "Supervisory Detention Deportation Officer." *Id.* at 2–3.

Gazazyan claims that on October 7, 2025, he had an interview with an officer. Dkt. 18 at 3–4. During that interview, Gazazyan states that the officer asked him for his biographical information, including information about the schools he attended in Armenia. *Id.* at 3. Gazazyan attests that "nothing during the interview was about the reasons for the revocation of my supervision order," and that he did "not have any opportunity to discuss why [he] thought [he] should be allowed to remain at home with

[his] family." *Id.* at 4. To date, Gazazyan remains detained at the Adelanto Detention Facility. Dkt. 1 at 4.

### C. Petition for Writ of Habeas Corpus

Following detainment, Gazazyan filed a "Verified Petition for Habeas Corpus and Complaint for Injunctive and Declaratory Relief" ("Pet."). Dkt. 1. Despite the word "Verified" appearing in the title, the Petition is not verified by Gazazyan or his attorneys. *See id.* at 14.[1] Named as Respondents are Kristi Noem, the Secretary of the Department of Homeland Security; Pamela Bondi, the United States Attorney General; and Ernesto Santacruz, Jr, Acting Field Office Director of the Los Angeles Office of ICE. *Id.* at 4–5.

Gazazyan asserts three categories of claims against Respondents: The first category raises the issue of whether Respondents violated Gazazyan's procedural due process rights because they failed to comply with the Immigration and Nationality Act ("INA") and its implementing regulations. The second category concerns the issue of whether his continued detention is unlawful because his removal to Armenia is not reasonably foreseeable, which the Court will refer to as the *Zadvydas* claim. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). The third category pertains to whether Respondents' expedited procedures detailed in the memo from Secretary Noem on March 30, 2025, for removing noncitizens may violate Gazazyan's procedural due process rights to raise a fear-based claim before being removed to a country other than Armenia.

Gazazyan now moves for a temporary restraining order, which requests the Court to: (1) order his immediate release until Respondents comply with the notice and informal interview process and present evidence that his removal is reasonably foreseeable; (2) enjoin Respondents from transferring him outside this district until the

---

[1] Local Rule 83-16.2 states that "[i]f the petition . . . is verified by a person other than the individual in custody, the person verifying the document shall set forth the reason why it has not been verified by the person in custody. The person verifying the document shall allege only facts personally known to that person. If facts are alleged upon information and belief, *the source of the information and belief shall be stated*." (emphasis added).

petition is resolved ; and (3) enjoin Respondents from removing him to a country other than Armenia without notice and a meaningful opportunity to raise a fear-based claim. Respondents filed an Opp'n, Gazazyan filed a Reply, and Respondents filed a Sur-Reply. Dkts. 7, 8, 11. The Court held a hearing on this matter on October 10, 2025. Dkt. 16. Without the Court's leave, on October 17, 2025, Gazazyan filed a supplemental brief that raises new arguments and offers additional evidence that was not raised in the Pet., Mot. or Reply. *See id.* On October 22, 2025, the Court issued an order declining to consider the arguments raised in supplemental briefing and granted Respondents leave to respond to the new evidence presented in the declarations. Dkt. 20 at 2. Two days later, Respondents filed a brief responding to the arguments in Gazazyan's supplemental briefing and attached to it a copy of the Notice. *See* Dkt. 21, 21-1. Because Respondents responded to those arguments, the Court will consider them below.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 65(b) governs temporary restraining orders. A temporary restraining order is an extraordinary remedy meant to preserve the status quo and to prevent irreparable harm "just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

The standard for issuing a TRO and preliminary injunction is the same. *See Xuyue Zhang v. Barr*, 612 F. Supp. 3d 1005, 1012 (C.D. Cal. 2020) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). To obtain a TRO, the movant must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors merge when a TRO is sought against the government, as is true here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In cases where there may be a strong showing on the balance of hardships but a weaker showing on the likelihood of success, a movant may still obtain a TRO under the

Ninth Circuit's sliding-scale approach. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). Under this sliding-scale approach, a movant may obtain a TRO if the movant can show (1) there are serious questions going to the merits, (2) there is a likelihood of irreparable injury, (3) the balance of hardships tips sharply towards the movant, (4) and the injunction is in the public's interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "'Serious questions' are ones 'that "cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation."'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (quoting *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023)). "They 'need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits."'" *Id.* (quoting *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). Even under this sliding-scale approach, a movant must still "make a showing on all four prongs." *Cottrell*, 632 F.3d at 1135.

The movant carries the burden of persuasion and must make a clear showing of entitlement to the requested relief. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Given the exigent nature of a TRO, a movant can rely on allegations in a verified complaint, exhibits, declarations, or affidavits, even if inadmissible under the Federal Rules of Evidence. *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) ("A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief.") *overruled on other grounds by Board of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc); *Flynt*, 734 F.2d at 1394 ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) ("A verified complaint or supporting affidavits may afford the basis for a preliminary injunction."). Unverified allegations in the pleadings and unsupported and conclusory statements are not enough to prevail on a motion for a TRO. *See Herb Reed Enters., LLC v. Fla. Ent.*

1  *Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (reversing district court's order granting preliminary injunction where it relied on unsupported and conclusory statements); *Greenberg v. Guzman*, No. CV 14-00866, 2014 WL 12569551, at *2 (C.D. Cal. July 28, 2014) ("A motion for preliminary injunction must be supported by '[e]vidence that goes beyond the unverified allegations of the pleadings.'") (quoting 9 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2949 (2011)).

## IV. DISCUSSION

Gazazyan asserts three categories of claims against Respondents: The first category raises the issue of whether Respondents violated Gazazyan's procedural due process rights because they failed to comply with the Immigration and Nationality Act ("INA") and its implementing regulations. The second category concerns the issue of whether his continued detention is unlawful because his removal to Armenia is not reasonably foreseeable, which the Court will refer to as the *Zadvydas* claim. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). The third category pertains to whether Respondents' expedited procedures detailed in the memo from Secretary Noem on March 30, 2025, for removing noncitizens may violate Gazazyan's procedural due process rights to raise a fear-based claim before being removed to a country other than Armenia.

### A. Likelihood of Success on the Merits
#### 1. Procedural Due Process Claims Regarding Revocation of Release and Re-detention

The Fifth Amendment's Due Process Clause prohibits the government from depriving a person of life, liberty, and property without due process of law. *See* U.S. Const. amend. V. At its core, due process requires the government to give a person reasonable notice and an opportunity to be heard. *See A. A. R. P. v. Trump*, 605 U.S. 91, 94-95 (2025) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). These protections extend to all persons physically present in the United States. *Zadvydas*, 533 U.S. at 693. This includes noncitizens and those whose presence is "lawful, unlawful, temporary, or permanent." *Id.* The Supreme Court has repeatedly held

for over a century that noncitizens present in the United States must be afforded certain procedural due process protections before they are detained or removed. *See, e.g.*, *A. A. R. P.*, 605 U.S. at 94 ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings.") (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Zadvydas*, 533 U.S. at 693 (holding that the Due Process Clause protects noncitizens subject to a final order of deportation); *Reno*, 507 U.S. at 306 (determining that due process is afforded to noncitizens); *Wong Wing v. United States*, 163 U.S. 228, 238 (1986) (concluding that the Due Process Clause protects noncitizens subject to removal order); *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903) (stating that administrative officers may not disregard due process of law when executing the deportation of noncitizens).

Gazazyan raises a few arguments contending why Respondents failure to comply with the INA and its implementing regulations violated his procedural due process rights. Dispositive here is his argument that Respondents did not properly give him notice because the ICE official who gave him the Notice did not have the authority to do so under 8 C.F.R. § 241.4(l)(2) ("Section 241.4").

Section 241.4 addresses the authority to keep a noncitizen in custody and grant release or parole under 8 U.S.C. §§ 1231(a)(6) and 1182(d)(5)(A). *See* 8 C.F.R. § 241.4. Section 241.4(l) establishes the circumstances and procedures for revoking a noncitizen's release. Under Section 241.4(l), a noncitizen's release may be revoked under two circumstances. *See* 8 C.F.R. § 241.4(l)(1)–(2).

First, release may be revoked if the noncitizen violates a condition of release. *Id.* § 241.4(l)(1).

> Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.

*Id.*

Second, the "Executive Associate Commissioner" or "district director" may exercise their discretion and revoke release if any of the following occur:

(i) The purposes of release have been served;

(ii) The alien violates any condition of release;

(iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or

(iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

*Id.* § 241.4(l)(2). Although Section 241.4(l)(2) does not explicitly state the procedure required for revoking release as does Section 241.4(l)(1), courts have held that Section 241.4(l)(2) requires the government to provide the same notice and informal interview required by Section 241.4(l)(1). *See Diaz v. Wofford*, No. 1:25-CV-01079, 2025 WL 2581575, at *5 (E.D. Cal. Sep. 5, 2025); *Bui v. Warden of the Otay Mesa Det. Facility*, No. 25-cv-2111, 2025 WL 2988356, at *3 (S.D. Cal. Oct. 23, 2025). ICE, like any federal agency, has a duty to follow its own regulations. *See United States v. Ramos*, 623 F.3d 672, 683 (9th Cir. 2010).

While Section 241.4(l)(2) explicitly authorizes the "Executive Associate Commissioner" or "district director" to revoke release, "the analysis is complicated by the fact that the immigration landscape changed after the September 11 terrorist attacks, and [S]ection 241.4 'refers to previous Immigration and Naturalization Service [('INS')] position titles.'" *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 160 (W.D.N.Y. 2025) (quoting *Rombot v. Souza*, 296 F. Supp. 3d 383, 387 (D. Mass. 2017)). After the September 11 attacks, Congress passed the Homeland Security Act, which abolished the Immigration and Naturalization Service, 6 U.S.C. § 291(a), and transferred all functions related to the detention and removal of noncitizens to the Secretary of Homeland Security—the head of the United States Department of Homeland Security ("DHS"), *id.* § 251.

Considering that references in Section 241.4 refer to former INS position titles, title 8 C.F.R. § 1.2 ("Section 1.2") was promulgated to define previous INS terms,

phrases, and position titles. *See* 8 C.F.R. § 1.2. Before March 1, 2003, "Commissioner" used to refer to "Commissioner of the Immigration and Naturalization Service," and "district director" referred to "the district director or regional service center director." *See id.* Today, "Commissioner" refers to the "Director of U.S. Citizenship and Immigration Services, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears." *See id.* "[D]istrict director" now means "asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge." *See id.*

        Considering Sections 1.2 and 241.4(l), the relevant inquiry is whether the Director of U.S. Citizenship and Immigration Services; the Commissioner of U.S. Customs and Border Protection; the Director of U.S. Immigration and Customs Enforcement; or asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge revoked Gazazyan's release.

        According to the Notice of Revocation, N. McKenna was the official who determined to revoke Gazazyan's release. *See* Dkt. 21-1 at 2. McKenna's title is "Supervisory Detention Deportation Officer." *Id.* at 3. However, there is no evidence, and Respondents offer none, to show that McKenna's role as the "Supervisory Detention Deportation Officer" equates to that of the Director of USCIS; Commissioner of CBP; Director of ICE; asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. Based on this record, the Court concludes that Gazazyan was not given valid notice of the reasons for the revocation of his release because McKenna did not have the authority to do so under Section 241.4(l)(2).

        Respondents nevertheless argue that McKenna has authority to revoke release under 8 C.F.R. §§ 241.4(c)(4) and (h)(5). As noted above, Section 241.4 addresses the

authority to keep a noncitizen in custody and grant release or parole. *See* 8 C.F.R. § 241.4. Section 241.4(a) provides, in relevant part, the following:

> The authority to continue an alien in custody or grant release or parole under [8 U.S.C. §§ 1231(a)(6) and 1182(d)(5)(A)] of the Act shall be exercised by the Commissioner or Deputy Commissioner, as follows: Except as otherwise directed by the Commissioner or his or her designee, the Executive Associate Commissioner for Field Operations (Executive Associate Commissioner), the Deputy Executive Associate Commissioner for Detention and Removal, the Director of the Detention and Removal Field Office or the district director may continue an alien in custody beyond the removal period described in section 241(a)(1) of the Act pursuant to the procedures described in this section.

*Id.* § 241.4(a).

Section 241.4(c) is titled "Delegation of authority." This section delegates the Attorney General's authority to make certain "custody determinations" under 8 U.S.C. §§ 1231(a)(6) and 1182(d)(5)(A) to certain officials. *See* 8 C.F.R. § 241.4(c)(1)–(3). For example, Section 241.4(c)(1) delegates the Attorney General's statutory authority to make initial custody determinations to the "district director or the Director of the Detention and Removal Field Office having jurisdiction over the alien." *Id.* § 241.4(c)(1). Likewise, Section 241.4(c)(2) delegates the Attorney General's authority to review of a noncitizen's custody after the initial 90-day removal period has passed to the "Executive Associate Commissioner, acting through the [Headquarters Post-Order Detention Unit ("HQPDU")]." *Id.* § 241.4(c)(2). Finally, Section 241.4(c)(3) delegates the Attorney General's authority to the Executive Associate Commissioner, who "shall appoint a Director of the HQPDU. The Director of the HQPDU shall have authority to establish and maintain appropriate files respecting each detained alien to be reviewed for possible release, to determine the order in which the cases shall be reviewed, and to coordinate activities associated with these reviews." *Id.* § 241.4(c)(3).

Section 241.4(c)(4) further delegates the authority to conduct the custody determinations detailed in Section 241.4(c)(1)–(3) as follows:

> All references to the Executive Associate Commissioner, the Director of the Detention and Removal Field Office, and the district director in this section shall be deemed to include any person or persons (including a committee) designated in writing by the Executive Associate Commissioner, the Director of the Detention and Removal Field Office, or the district director to exercise powers under this section.

8 C.F.R. § 241.4(c)(4).

Section 241.4(h) is titled "District director's or Director of the Detention and Removal Field Office's *custody review procedures*." *Id.* § 241.4(h) (emphasis added). As the title suggests, this section establishes the "procedures" for determining whether a noncitizen should remain in custody or should be released on supervision. *See* 8 C.F.R. § 241.4(h)(1)–(4). Section 241.4(h)(5) gives the "district director" or "Director of the Detention and Removal Field Office" the authority to delegate their obligations "to conduct the custody review, develop recommendations, or render the custody or release decisions to those persons directly responsible for detention within his or her geographical areas of responsibility." *See id.* § 241.4(h)(5).

> This includes the deputy district director, the assistant director for detention and deportation, the officer-in-charge of a detention center, the assistant director of the detention and removal field office, the director of the detention and removal resident office, the assistant director of the detention and removal resident office, officers in charge of service processing centers, or such other persons as the district director or the Director of the Detention and Removal Field Office may designate from the professional staff of the Service.

*Id.*

Although it is true that Sections 241.4(c)(4) and (h)(5) delegate custody determinations to certain officials, nothing in the regulatory language suggests this delegation of authority equally applies to determinations pertaining to a noncitizen's revocation of supervised release. In fact, Section 241.4(l)(2)—the provision relied upon by Respondents to revoke Gazazyan's supervised release—expressly identifies who has the authority to make this determination: the "Executive Associate Commissioner" and a "district director." 8 C.F.R. § 241.4(l)(2). And unlike Sections 241.4(c)(4) and (h)(5),

Section 241.4(l)(2)'s contains no language that gives the Executive Associate Commissioner or a district director the authority to further delegate these revocation determinations to other officials.

Moreover, Respondents' argument would render portions of Section 241.4 superfluous. For example, if Section 241.4(c)(4) alone properly delegated the responsibilities outlined in Section 241.4 as a whole, then it would render Section 241.5(h)(5)'s delegation provision redundant. And the inverse is true with regard to Sections 241.4(h)(5) and (c)(4). But Section 241.4 "'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 556 (9th Cir. 2024) (quoting *Nacarino v. Kashi Co.*, 77 F.4th 1201, 1210 (9th Cir. 2023)). To give effect to all of Section 241.4's provisions, it becomes evident that Section 241.4 intended to delegate certain responsibilities to certain officials under Sections 241.4(c)(4) and (h)(5) but did not delegate the authority to revoke supervised release status under Section 241.4(l)(2) to officials other than the Executive Associate Commissioner or a district director.

For these reasons, Gazazyan is likely to succeed on the merits of these procedural due process claims.

        2.    *Zadvydas* claims

As regards to the removal procedures of noncitizens from the United States, the INA details such procedures. *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021). When a noncitizen has been ordered removed, the government must remove that person from the United States within 90 days. *See* 8 U.S.C. § 1231(a)(1)(A). The removal period begins when the latest of the following occurs: "(1) the date the order of removal becomes 'administratively final,' (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the alien is released from non-immigration detention or confinement." *Johnson*, 594 U.S. at 528 (citing 8 U.S.C. § 1231(a)(1)(B)(i)-(iii)). Detention is mandatory during the removal period. *See* 8 U.S.C.

§ 1231(a)(2)(A). If the noncitizen is not removed within 90 days, the person must be released subject to supervision. *See id.* § 1231(a)(3); *see also* 8 C.F.R. § 241.13(h)(1) (detailing conditions of release).

Effectuating actual removal within 90 days is not always possible. *See Zadvydas*, 533 U.S. at 701. Recognizing this practical reality, certain classes of detainees, like those who have committed an aggravated felony, may be detained beyond the initial 90 days for a "period reasonably necessary" to remove the noncitizen. *See id.* at 689. Presumptively, this reasonably necessary period cannot exceed six months from the beginning of the removal period. *See id.* at 701. Because noncitizen detainees cannot be indefinitely detained, after the six-month removal period has elapsed, the noncitizen may be released if he or she "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* Assuming this showing can be made, the burden then shifts to the government to introduce evidence to refute that assertion. *See id.*

Here, Gazazyan argues he is likely to succeed on his *Zadvydas* claims because he has been detained beyond the presumptively reasonable six-month period, and his removal is reasonably foreseeable. Dkt. 2-1 at 7–8.

The latter point need not be addressed because Gazazyan has not made the threshold showing that he was detained beyond the six-month period. Based on evidence attached to the Reply, Gazazyan was ordered removed from the United States on February 3, 2004. Dkt. 8-2 at 1. Even assuming the removal period began on February 3 and that he was detained until May 3, 2004, which is the last day of the mandatory 90-day detention period, there is no evidence to support that Gazazyan was detained for the remainder of the six-month period. At best, his attorney states in her declaration that she knows Gazazyan was detained for "some period of time" after the removal order. *See* Dkt. 8-1 at 2. However, this unverified statement alone is not enough to show that Gazazyan was detained beyond the presumptively reasonable six-month period. Without more, he has not made a clear showing that he is likely to succeed, or has a fair chance of

success, on the merits of his *Zadvydas* claims. *See Ruiz v. Warden*, No. 25-cv-02486, at *5 (C.D. Cal. Sep. 23, 2025) (holding petitioner was not likely to succeed on the merits where petitioner failed to present evidence of actual detention beyond six-month period) (Dkt. 8).

### 3. Procedural due process claim related to third-country removal[2]

When a noncitizen is ordered removed from the United States, an immigration judge must identify a removal country or alternative countries to which the noncitizen must be removed. *See Hadera v. Gonzales*, 494 F.3d 1154, 1156 (9th Cir. 2007); 8 C.F.R. § 1240.12(d). If the government is unable to remove the noncitizen to a designated country, the immigration judge's order does not limit the government's authority to remove the noncitizen "to any other country as permitted by section 241(b) of the Act." *See* 8 C.F.R. § 1240.12(d). The government may not, however, remove a noncitizen to any country if his or her "life or freedom would be threatened in that country because of [his or her] race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1231(b)(3)(A).

Gazazyan argues he is likely to succeed on his third country-removal claim because, *if* Respondents intend to remove him to a country other than Armenia, the new expedited removal procedures outlined in a memo from Secretary Noem violates his due process rights to raise a fear-based claim. Dkt. 2-1 at 8–9.

However, this claim is not ripe. Article III of the Constitution confines federal courts' jurisdiction to deciding live cases or controversies. *See* U.S. Const. art. III, § 2. Article III is comprised of four justiciability doctrines: ripeness, standing, mootness, and political question. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Relevant here are the closely related doctrines of ripeness and standing. The ripeness

---

[2] The phrase "third country" is not a defined term in the INA or its implementing regulations. *See* 8 U.S.C. § 1101. This phrase, as used by the Parties, seems to refer to a country that was not designated by the immigration judge during the removal proceedings.

doctrine prevents federal courts from prematurely deciding issues that are abstract, hypothetical, or speculative. *Flaxman v. Ferguson*, 151 F.4th 1178, 1184 (9th Cir. 2025). This doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . .'" *Project Veritas v. Schmidt*, 125 F.4th 929, 940 (9th Cir. 2025) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). The ripeness doctrine boils down further into two components: constitutional ripeness and prudential ripeness. *Id.* at 941.

Constitutional ripeness is synonymous with Article III's injury-in-fact prong for standing. *See Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022). Whether framed as constitutional ripeness or standing, a claim is ripe if the person suffers an injury that is concrete and imminent, among other things. *See Flaxman*, 151 F.4th at 1185. An injury is concrete if it actually exists. *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018). And an imminent injury is one that is "certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Prudential ripeness, by contrast, is "guided by two overarching considerations: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *See Project Veritas*, 125 F.4th at 941 (quoting *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1154 (9th Cir. 2017)). When no live case or controversy exists, a federal court must refrain from issuing advisory opinions or declaring rights in hypothetical cases. *See Clark*, 899 F.3d at 808.

Upon review, Petitioner's claim is not ripe as it is based on Gazazyan's speculation that he *may* be deprived of the opportunity to raise any fear-based claims *if* and *when* Respondents decide to remove him from the United States to third country on an expedited basis. Petitioner has provided no evidence to show that Respondents are attempting to remove him to a third country—a point the Parties acknowledged at the hearing. The record before the Court shows Respondents' only attempt to remove Gazazyan, since his order of removal in 2004, was to Armenia. Gazazyan's alleged due process injury is thus neither concrete nor imminent and therefore, the

third-country-removal claim is not constitutionally ripe for decision. *See Yang v. Kaiser*, No. 2:25-cv-02205, 2025 WL 2791778, at *2 n.3 (E.D. Cal. Aug. 20, 2025) (denying motion for a TRO to order the government from removing petitioner to a third country because that issue was not presently before the district court where there was no evidence to support that petitioner was subject to a third-country removal); *cf. Grigorian v. Bondi*, No. 25-CV-22914, 2025 WL 1895479, at *6 (S.D. Fla. July 8, 2025) (holding plaintiff did not have standing to bring third-country-removal claim where plaintiff's deprivation of ability to raise fear based claim before removal to a third country had not yet happened). Because this claim is not constitutionally ripe, the Court need not decide whether the claim is prudentially ripe. *See Wolfson v. Brammer*, 616 F.3d 1045, 1063 (9th Cir. 2010) (declining to reach prudential ripeness where claims were not constitutionally ripe). Thus, the Court concludes that Gazazyan has not clearly shown that he is likely to succeed, or has a fair chance of success, on his third-country-removal claim, and it is denied.

### B. Irreparable Harm

Gazazyan is likely to suffer irreparable harm in the absence of temporary injunctive relief. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Here, Gazazyan has shown he is likely to suffer irreparable harm because, as discussed above, Respondents have likely deprived him of his procedural due process rights by revoking his release by an ICE officer who was not vested with the authority to make that decision. In turn, "'no further showing of irreparable injury is necessary.'" *Pinchi v. Noem*, No. 5:25-cv-05632, 2025 WL 2084921, at *6 (N.D. Cal. July 24, 2025) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005)).

### C. Balance of Equities and Public Interest

The last two factors—balance of equities and public interest—also weigh in favor of granting the Mot. With regard to the balance of the equities, Gazazyan faces a likely

violation of his procedural due process rights and faces continuing harm by remaining in immigration custody. Respondents, by contrast, will suffer minimal injury with a short delay in their ability to revoke Gazazyan's supervised release order upon adequate notice and by someone with the requisite authority, if necessary. Moreover, "[t]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (quoting *Jorge M.F. v. Wilkinson*, No, 21-cv-01434, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021)).

### D. Bond

A court may issue a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court "with discretion as to the amount of security required, *if any*."'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). A district court "'may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm" to the nonmovant. *Id.* (quoting *Jorgensen*, 320 F.3d at 919). The nonmovant is not absolved of its "obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).

Here, Respondents have not presented any evidence that would show a bond is necessary in this case. The Court thus exercises its discretion and waives the bond requirement.

## V. CONCLUSION

For the above reasons, the Mot. is **GRANTED, IN PART** with respect to the procedural due process claims regarding the revocation of his release and re-detention. The Court **ORDERS** as follows:

1. Respondents, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Respondents are **ORDERED** to immediately release Gazazyan from immigration custody;

2. Respondents, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Respondents are also **ENJOINED** from revoking Gazazyan's release without adequate notice and from detaining him without a prompt informal interview.

3. This order will remain in effect until November 21, 2025, at 5:00 p.m. This order may be extended for good cause or with Respondents' consent; and

4. Respondents are **ORDERED TO SHOW CAUSE** on November 12, 2025, at 2:00 p.m. why a preliminary injunction should not issue. *See* C.D. Cal. R. 65-1. Gazazyan may supplement this Mot. no later than November 14, 2025, and Respondents must file any written response to the Order to Show Cause no later than November 17, 2025. Gazazyan may file a reply no later than November 19, 2025. The Court will set a hearing only if necessary.

//
//
//

Moreover, the Court concludes that Gazazyan's request to enjoin Respondents from transferring him outside this district until the petition is resolved is moot in light of this Court's prior order under the All Writs Act. Dkt. 5. Additionally, because Gazazyan's third-country-removal claim is not constitutionally ripe, the Court concludes it would be premature to order Respondents to provide him with notice and an opportunity to raise a fear-based claim before removing him to a country other than Armenia.

**IT IS SO ORDERED.**

Dated: November 7, 2025

HON. SERENA R. MURILLO
UNITED STATES DISTRICT JUDGE